```
           IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

```
TOPSHELF MANAGEMENT, INC.;       )
TOPSHELF CO., LLC; TOPSHELF      )
COMPANY, LLC f/k/a SHOWTIME      )
SPORTS AND MARKETING, LLC; and   )
SHOWTIME MOTORSPORTS, INC.,      )
                                 )           1:15cv00939
          Plaintiffs,            )
                                 )
     v.                          )
                                 )
CAMPBELL-EWALD COMPANY,          )
                                 )
          Defendant.             )
```

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This is an action by Plaintiffs Topshelf Company, LLC ("Topshelf"), successor in interest to Showtime Motorsports, Inc. ("Showtime"), and Topshelf Management, Inc. ("Topshelf Management"), all owned and operated by Brian Efird,[1] arising out of former business relationships with Defendant Campbell-Ewald Company ("CEC"). Before the court is CEC's motion for summary judgment as to Plaintiffs' third claim for relief, which charges that CEC engaged in unfair and deceptive trade practices through a series of allegedly misleading representations. (Doc. 25.) The motion has been fully briefed (Doc. 27; Doc. 30; Doc. 31) and is ready for decision. For the reasons set forth below, the motion

---

[1] CEC argues that Topshelf can sue only for itself and not on behalf of its predecessor, Showtime. (Doc. 31 at 2-3.) Because the court grants CEC's motion for summary judgment on other grounds, this issue need not be reached.

will be granted and, because all other claims have previously been dismissed (Doc. 17), the action will be dismissed.

I. **BACKGROUND**

The facts, viewed in the light most favorable to Plaintiffs as the non-moving parties, establish the following:

A. **CEC's Contract with the Navy**

CEC is an advertising company that provided marketing services to the U.S. Navy from 2005 to 2013. (Doc. 26 ¶¶ 2, 4, 6, 15.) During that time, one of CEC's responsibilities was to run "field events," such as fairs and airshows, as part of the Navy's recruitment efforts. (Id. ¶ 4.) A component of these shows were Navy simulators, which CEC contracted to provide, that reproduced the effect of flying a Navy jet. (Id. ¶ 10.)

From 2005 to 2009, CEC's dealings with the Navy were governed by an umbrella contract that authorized the Navy to spend hundreds of millions of dollars on marketing for up to five years; however, the agreement obligated the Navy to spend a minimum of $5 million and committed the Navy to no more than one year of service. (Id. ¶¶ 5-6.) After the first year, each additional year was at the Navy's option. (Id. ¶ 6.)

On May 20, 2009, CEC entered into a new umbrella contract with the Navy, which contained the same essential terms. (Id. ¶ 8-9.) Like the earlier contract, this contract was eligible to run up to five years and in fact remained in effect until 2013,

when the Navy ceased contracting with CEC. (Id. ¶¶ 8-9, 15.)

Under these umbrella contracts, the Navy would issue a statement of work to CEC that requested specific services. (Id. ¶ 13.) CEC would then provide pricing information to the Navy, after which the Navy would issue a task order for the requested services. (Id.) Once it received the task order, CEC would issue a corresponding purchase order to a subcontractor. (Id.) Thus, under its contract with the Navy, CEC could issue a purchase order only if and when the Navy had first issued a task order.[2]

**B. Showtime's Subcontract with CEC**

CEC first met with Efird in 2008 to consider subcontracting its Navy simulator work to Showtime, another marketing company. (Id. ¶ 7; Doc. 30-2 at 14.) On September 8, 2008, Showtime signed CEC's Purchase Order Terms and Conditions form that would govern each purchase order. (Doc. 26-5 at 22.) This document set forth the boundaries of the relationship, including that no work performed by Showtime would be authorized or reimbursed prior to the issuance of a purchase order. (Id. at 2.) It also included a merger clause stating that the agreement is "binding and complete," "supersedes all other agreements and representations,"

---

[2] Topshelf's complaint alleges that after CEC stopped subcontracting with it, CEC created a company to deceive the Navy into believing it met the small business requirement of the umbrella contract that Topshelf previously satisfied. (Doc. 1 ¶ 30.) That argument appears to have been abandoned (Doc. 27 ¶¶ 24-25), so it is not addressed further.

and cautions that no "additions or modifications to this Agreement shall be effective unless they are in writing, signed by both parties, and make specific reference to this Agreement." (Id.)

On October 6, 2008, Efird received an email from John Schroeder, a CEC employee who served as the main point of contact with Efird, stating that CEC was in the process of "responding to a 10-year pricing request" from the Navy for business marketing services. (Doc. 30-3 at 9.)[3] The email also stated that CEC was planning to "select Showtime Motorsports as [its] primary partner for supplying the next generation of interactive mobile simulators." (Id.)

In November of 2008, CEC issued Showtime a purchase order for three months, subject to CEC's Purchase Order Terms and Conditions. (Doc. 26-4 at 5-6.) Pursuant to this purchase order, Showtime was able to supply two simulators ("Sims 1 and 2"), both manufactured by Doron Precision and refurbished by Showtime, in under five weeks for a Navy event in December 2008. (Doc. 30 at 2; Doc. 30-2 at 8-9.) Apparently approving of Showtime's work, CEC chose to continue to subcontract simulator work to Showtime, and from March 11, 2009, to August 24, 2010, CEC issued multiple purchase orders to Showtime to supply and operate Sims 1 and 2 for various periods of time

---

[3] At the time this email was written, CEC believed the umbrella contract would be for a maximum of ten years. (Doc. 32 ¶ 2.) Instead, as noted above, CEC entered into two contracts with a maximum of five years each. (Id.; Doc. 26 ¶¶ 6, 9.)

4

(ranging from a few months to a few days, but less than a year each). (Doc. 26-4 at 8–14.) During the course of these short-term purchase orders, Efird acknowledged that Showtime was not working under a long-term contract. (Doc. 27-3 at 26.)

    **C.    Showtime's Dissolution and CEC's Decision to Supply Sim 3**

In June 2010, as a result of the Navy's changes to its simulator program, CEC's Schroeder issued a request for proposal that called for a subcontractor to provide the Navy with three new simulators. (Doc. 27-3 at 32.) When the Navy modified its request to call for only one simulator ("Sim 3"), CEC similarly modified its request for proposal in July 2010. (Id. at 37.) In response, CEC received bids from multiple vendors, including Showtime; CEC also considered an internal proposal to supply Sim 3 itself, without a subcontractor. (Doc. 27-3 at 19, 38–44.) After reviewing these bids, CEC decided to subcontract the Sim 3 work to Showtime. (Doc. 27-1 at 49.)

In late August 2010, Schroeder left CEC and was replaced by Yvonne Hughes. (Doc. 26 ¶ 23; Doc. 27-3 at 3)  On September 3, the Navy issued CEC a task order for Sim 3. (Doc. 26-3 at 44–52.) In turn, on September 8, Hughes advised Efird that "Showtime has been awarded the additional Navy Simulator business" and that once she received the exact proposal Efird had sent to Schroeder, she could issue a purchase order to Showtime for the work on Sim 3.

5

(Doc. 27-1 at 49.) However, on September 21, before CEC could issue a purchase order, Efird's attorney wrote CEC that Showtime was "winding up its operations" and "dissolving at the end of 2010." (Doc. 27-2 at 30.) The letter also notified CEC that Efird would be associated with a new company, Topshelf Management, which would be available to enter into contracts with CEC. (Id.)

Following this news, CEC reconsidered its decision to issue Showtime a purchase order for Sim 3 and decided to do the work itself. (Doc. 27-4 at 19-22.) In assessing its vendor options, CEC noted that Showtime was a "B+" vendor with "financial response issues" and a "short cut mentality." (Doc. 30-3 at 40.) CEC also observed that Topshelf Management may be going through an "ownership and management reorganization" that could impact its performance. (Doc. 27-4 at 19.) CEC expressed this concern both internally and in its communications with the Navy. (Id. at 19-21; Doc. 30-5 at 44-45.)

In order to prepare to supply Sim 3 itself, but without informing Topshelf Management, CEC contacted two simulator manufacturers, Metropolis and Doron Precision,[4] to gather details about manufacturing a new sim. (Doc. 27-2 at 3-5.) CEC also sought detailed technical information regarding simulators from

---

[4] After making these inquiries, CEC decided to use Doron Precision to manufacture Sim 3. (Doc. 26 ¶ 22.) As noted above, this was the same company Showtime worked with to supply Sims 1 and 2.

6

Topshelf Management, claiming to need the information in order to match Topshelf Management's scope of work with the Navy's request. (Doc. 30-2 at 13.)

   D.   **Topshelf's Subcontract with CEC**

From October 26, 2010, through at least June 17, 2011, CEC expressed to Efird serious concerns about Showtime's, and later Topshelf's, performance. (Doc. 30-5 at 50–65.) These complaints included Sims 1 and 2 being in unacceptable condition; the simulators failing to work; and unprofessional conduct by Topshelf's employees. (Id.; Doc. 27-2 at 46–50.) During that time, Topshelf refurbished Sims 1 and 2 at the cost of "tens of thousands of dollars." (Doc. 30-2 at 19; Doc. 30-5 at 53–62.) Topshelf did so in the belief it would receive another purchase order from CEC because, according to Efird, "[t]hat's just how business was always done." (Doc. 30-2 at 20.)

By 2011, Efird had changed business entities again and was conducting business with CEC through Topshelf, rather than Topshelf Management. (Doc. 27-1 at 19–20.)[5] Despite being upset and expressing his displeasure to CEC after learning that Topshelf did not receive a purchase order for Sim 3, Efird decided to "tak[e] the high road" and have Topshelf continue to supply Sims 1 and 2 for CEC. (Id. at 57; Doc. 30-2 at 18.) On January 4,

---

[5] Topshelf Management continues to exist and shares office space with Topshelf. (Doc. 1 ¶ 7.)

7

2011, Topshelf signed the same Purchase Order Terms and Conditions form that Showtime had executed and was issued a purchase order from CEC to supply Sims 1 and 2 from January 12, 2011, through January 12, 2012. (Doc. 26-4 at 15; Doc. 26-5 at 15.) Hughes advised Efird that even with a one-year purchase order, "there are no guarantees, [and the] Navy can cancel the contract at anytime [sic]." (Doc. 27-1 at 54.) At one point, Efird acknowledged: "I have never had a contract. All I ever have [sic] is a PO." (Id. at 53.)

During his working relationship with CEC, Efird (on behalf of Showtime, and then Topshelf) tried to negotiate a long-term contract. (Doc. 27-3 at 13–15, 27.) However, Schroeder, Hughes, and Charles Spieser, another CEC employee who dealt with both Showtime and Topshelf, all deny ever having made any promises of long-term work. (Doc. 27-2 at 8–13; Doc. 27-3 at 9, 18–22; Doc. 27-4 at 4–12.) Efird admitted that his expectation of receiving future purchase orders was based on his impression that the "gist" of the relationship with CEC was that if CEC "had the Navy relationship," then Topshelf would be "providing the simulators" for them. (Doc. 27-1 at 8.)

On December 12, 2011, CEC informed Efird that it received a statement of work from the Navy that discontinued Sims 1 and 2 and that Topshelf's work on those simulators would cease on January 12, 2012. (Id. at 59.) CEC continued to provide Sim 3, as well

as another simulator, also constructed by Doron Precision, for the Navy until January of 2013, when the Navy stopped using simulators from CEC. (Doc. 26 ¶¶ 15, 22.)

Topshelf initially sued CEC in Forsyth County Superior Court on October 29, 2014. (Doc. 9 ¶ 1.) The case was removed to this court and on August 3, 2016, was dismissed without prejudice because the claims lacked the requisite particularity. (Id. ¶¶ 2-3.) On November 15, 2016, Topshelf filed the present complaint, alleging negligent misrepresentation (first claim for relief), fraud (second claim for relief), violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 (third claim for relief), and breach of contract (fourt claim for relief). (Doc. 1 ¶¶ 36, 42, 46, 54.) On August 26, 2016, the court granted CEC's motion to dismiss the first, second, and fourth claims, finding them barred by the statute of limitations. (Doc. 17.)[6] Following discovery, CEC filed the present motion for summary judgment on the remaining UDTPA claim. (Doc. 25.)

## II. ANALYSIS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant

---

[6] CEC did not assert the statute of limitations as a defense to Topshelf's UDTPA claim in its motion to dismiss (Doc. 6 at 3 n.1), but now argues that this claim is time-barred as well (Doc. 27 at 23). Because the court grants CEC's motion for summary judgment on other grounds, this argument need not be reached.

9

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Developers, Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pennsylvania Nat. Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Associates, Inc., 21 F.3d 52, 55 (4th Cir. 1994)).

To establish a UDTPA claim, a plaintiff must show that the defendant (1) committed an unfair or deceptive act or practice, (2) which was in or affecting commerce, and which (3) proximately caused it injury. Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). An act or practice is unfair "if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," and is deceptive "if it has the capacity or tendency to deceive." Ace Chem. Corp. v. DSI Transp., Inc., 115 N.C. App.

10

237, 247, 446 S.E.2d 100, 106 (1994) (internal citations and quotations omitted). As this court previously noted, "[t]he crux of [UDTPA] claims is usually determining what conduct suffices as 'unfair or deceptive,' which is a question of law for the court." Topshelf Mgmt., Inc. v. Campbell-Ewald Co., 117 F. Supp. 3d 722, 729 (M.D.N.C. 2015).

A breach of contract, even if intentional, does not constitute a UDTPA violation unless it is accompanied by substantial aggravating circumstances. Canady v. Crestar Mortgage Corp., 109 F.3d 969, 975 (4th Cir. 1997). However, the exercise of a contractual right can be an unfair or deceptive practice if it involves egregious and aggravating conduct. S. Atl. Ltd. P'ship of Tennessee, L.P. v. Riese, 284 F.3d 518, 539 (4th Cir. 2002).

A misrepresentation, even absent intent or bad faith, can constitute an unfair and deceptive trade practice so long as a party's words or conduct possess the requisite tendency or capacity to mislead. First Atl. Mgmt. Corp. v. Dunlea Realty Co., 131 N.C. App. 242, 254, 507 S.E.2d 56, 64 (1998). To make a successful UDTPA claim based on a misrepresentation, a plaintiff must show that it actually relied on the misrepresentation and that such reliance was the proximate cause of the injury. Tucker v. Boulevard at Piper Glen, LLC, 150 N.C. App. 150, 153–54, 564 S.E.2d 248, 251 (2002). Lastly, an unfulfilled promise cannot be the basis for an unfair and deceptive trade practice claim unless the

promise was made fraudulently with no intention to carry it out. Smith v. Central Soya of Athens, Inc., 604 F. Supp. 518, 530 (E.D.N.C. 1985).

Topshelf argues that CEC violated the UDTPA in two distinct ways: (1) choosing to supply Sim 3 itself, after having led Topshelf to believe that it would receive a purchase order for it; and (2) making a series of representations that led Topshelf to believe that it would receive future purchase orders, and then abruptly ending the parties' working relationship knowing that Topshelf had invested in updating Sims 1 and 2. Each argument will be addressed in turn.

### A. CEC's Decision to Supply Sim 3.

Topshelf argues that CEC violated the UDTPA in regard to its conduct involving Sim 3 by (1) deciding to supply Sim 3 itself, after having informed Showtime it would receive a purchase order for it; (2) creating a secret list of purported issues with Showtime's performance to justify its choice to supply Sim 3 itself; (3) contacting Metropolis and Doron Precision about building Sim 3 without Topshelf Management's knowledge; and (4) requesting detailed specifications from Topshelf Management about building Sim 3 under the guise of assisting Topshelf Management comply with the Navy's requests for work. CEC denies that it created a secret list of issues but rather compiled a list of pros and cons for each of the vendors that submitted a proposal for Sim

3. CEC also emphasizes the fact that it chose Showtime to supply Sim 3 and only changed its mind when it learned of Showtime's dissolution. CEC further argues that, having not issued a purchase order to Showtime, CEC had no contract with Showtime regarding Sim 3 and was free to contact Doron Precision and Metropolis.

The court agrees with CEC. As an initial matter, Plaintiffs have not demonstrated how Showtime could have been damaged by any alleged unfair or deceptive conduct in connection with its failure to have been awarded Sim 3. By its own admission, Showtime was winding up operations in September 2010 and would be dissolved by year-end. It was not accepting new business. (Doc. 27-2 at 30.) As such, it could not have accepted a purchase order for Sim 3.

Moreover, Plaintiffs have offered no evidence to suggest that CEC's statement offering Showtime a purchase order for Sim 3 was false when it was made; instead, it appears that CEC simply changed its mind about this purchase order when it learned of Showtime's dissolution. Smith, 604 F. Supp. at 529–31 (holding that a promissory statement of future intent which does not come to fruition is not an unfair or deceptive practice). Further, there is no evidence that CEC engaged in a campaign against any of the Plaintiffs in an effort to take over the work for Sim 3. To the contrary, CEC initially decided to award Showtime the purchase order for Sim 3. Only after learning of Showtime's dissolution did CEC reconsider and inform the Navy that it considered

13

Showtime's change of business entities to have "impaired the vendor's ability to deliver SIM 3 on time and on budget." (Doc. 30-5 at 45.) Nevertheless, CEC advised the Navy that Showtime had "provided adequate service" on Sims 1 and 2 and should be allowed to continue on those contracts. (Id.)

CEC is also correct that evaluating the pros and cons of a subcontractor under these circumstances is not a violation of the UDTPA. See S. Atl. Ltd. P'ship of Tennessee, L.P., 284 F.3d at 535 (noting that "only practices that involve '[s]ome type of egregious or aggravating circumstances' are sufficient to violate the UDTPA") (quoting Dalton, 353 N.C. at 657, 548 S.E.2d at 711)). Showtime's dissolution was a significant, material event sufficient to have concerned CEC enough to revisit its decision whether to continue doing business with Showtime. CEC's decision reflects a rational business response.[7] It is not the kind immoral, unethical, oppressive, or unscrupulous conduct that can give rise to an UDTPA claim. See Ace Chem. Corp., 115 N.C. App. at 247, 446 S.E.2d at 106. Plaintiffs' attempt to mischaracterize Showtime's dissolution as "essentially just a name change" (Doc. 30 at 4)

---

[7] Topshelf also argues that if CEC "had true concerns regarding Plaintiffs' ability to perform and satisfy the Navy's demands, Defendant would not have continued to represent to the Navy and to Plaintiffs, that Plaintiffs[] should continue to work on the first and second simulator." (Doc. 30 at 19-20.) This argument is unpersuasive. Asking Topshelf to continue its work under the current purchase order for Sims 1 and 2 is entirely different from asking Topshelf to take on a new project constructing and operating Sim 3.

14

ignores the company's material negative change in financial condition. Thus, neither CEC's representation to Showtime nor CEC's decision to supply Sim 3 was an unfair or deceptive act.

Further, the Purchase Order Terms and Conditions forms that Topshelf signed preclude Plaintiffs' claims. The form made clear that no work could be assigned before issuance of a purchase order, and they also included a merger clause that supersedes all written and oral representations made before the forms were signed. Smith, 604 F. Supp. at 526–27. Given that CEC informed Showtime that it would be awarded the purchase order for Sim 3 on September 8, 2010, and Topshelf signed the form on January 4, 2011, the claim that Showtime relied on representations of receiving the purchase order is barred by the terms of the form. Also, as CEC made clear that there could be no agreement absent the issuance of a purchase order, and CEC never issued a purchase order to any Plaintiff for Sim 3, no Plaintiff has a claim based on Sim 3.[8] Any argument that CEC committed an unfair or deceptive act by failing to contract for Sim 3 therefore fails. Canady, 109 F.3d at 975.

Finally, Plaintiffs have failed to show that CEC's actions were the proximate cause of any harm suffered. While Topshelf claims it incurred expenses upgrading Sims 1 and 2 (Doc. 30 at

---

[8] Showtime dissolved before CEC could ever issue a purchase order for Sim 3 but, as noted, the court need not rely on this additional ground.

15

10), any attempt to tie these expenses to a belief that it would receive a purchase order for Sim 3 fails, given that these upgrades occurred well after Topshelf learned that it would not receive a purchase order for Sim 3. (See Doc. 27-1 at 57–58.) Moreover, Plaintiffs have not explained how they were harmed by CEC's inquiries of Topshelf Management or of Doron Precision and Metropolis about simulator manufacturing. Dalton, 353 N.C. at 656, 548 S.E.2d at 711 (2001).[9] Consequently, Plaintiffs' contentions as to Sim 3 are unavailing, and CEC's motion for summary judgment will be granted.

    **B. CEC's Representations About a Long-Term Working Relationship.**

Plaintiffs next argue that CEC engaged in a series of misrepresentations that caused Topshelf to believe it was performing at, or above, expectations and would continue to receive purchase orders from CEC. These alleged misrepresentations include statements that (1) CEC and Topshelf were a team; (2) the working relationship with Topshelf was a high priority for CEC; (3) CEC was working to protect the best interests of Topshelf; (4) praised the quality of Topshelf's work; and (5) generally gave Plaintiffs the impression that they would receive purchase orders from CEC as long as CEC was contracting with the Navy for

---

[9] Any claim by Topshelf that it was injured by CEC reaching out to Doron Precision or Metropolis is undermined by the fact that that Efird emailed Spieser that he "would have gladly" helped CEC with the "buildout" of Sim 3, if he had been asked. (Doc. 27-1 at 57.)

simulators.  Topshelf also argues that it spent "tens of thousands of dollars" to upgrade Sims 1 and 2, in reliance on its expectation of receiving future purchase orders shortly before CEC ended its working relationship with Topshelf.  (Doc. 30-2 at 19.)

CEC denies that it made any promises of future work to Plaintiffs and contends that the absence of any record evidence of any representations belies the claim.  In addition, CEC contends that any claim of reliance on any alleged statement nevertheless would not be justified due to the merger clause and CEC's undisputed repeated warnings that the Navy could cancel the purchase orders at any time, or simply refuse to issue further statements of work for the simulators.

Again, the court agrees with CEC.  CEC made clear that it did not have any long-term contract with Topshelf.  (Doc. 27-1 at 53–54.)  Instead, Showtime and Topshelf agreed that they worked under a series of short-term purchase orders.  (Id.; Doc. 27-3 at 26.)  Even within the duration of those purchase orders, CEC advised Topshelf that the purchase orders were subject to cancellation by the Navy at any time. (Doc. 27-1 at 53–54.)  Efird was also aware that Showtime, and then Topshelf, could only receive purchase orders for Sims 1 and 2 if the Navy requested that CEC provide simulators.  (See id. at 8–10; Doc. 27-2 at 13.)  There is no dispute that the Navy cancelled its program for Sims 1 and 2 in January of 2012.  (Doc. 27-1 at 59.)  There is nothing unfair or

17

deceptive about not extending a subcontractor relationship when the underlying employer discontinues the work.

CEC is also correct that Plaintiffs cannot claim to have been deceived by any positive comments or vague statements about future expectations of work with CEC; such statements, particularly in light of the written terms of the contractual relationship, cannot give rise to an unfair and deceptive practices claim. Smith, 604 F. Supp. at 527, 530–31 (holding that "expressions of belief or opinion regarding the future of plaintiffs' and defendants' respective businesses" and "promissory statement[s] of future intent" do not violate the UDTPA).

Finally, for these same reasons, Topshelf cannot succeed in claiming that it was somehow misled into upgrading Sims 1 and 2 in reliance on CEC's representations of further work. There is nothing in the record to suggest that CEC represented to Topshelf that if it made these upgrades, it would receive further purchase orders. Until a purchase order was issued, no Plaintiff had any legitimate expectation of future work. To have hoped otherwise, particularly based on Efird's explanation, "[t]hat's just how business was done" (Doc. 30-2 at 20), simply counted chickens before they hatched. It fails to serve as a basis on which to claim that CEC's conduct was unfair or deceptive, particularly in light of the contractual relationship between the parties. As a factual matter, moreover, the record reflects that these upgrades

were necessary in order for Topshelf to *continue* to carry out its work under its purchase order for Sims 1 and 2, ending in January of 2012. (Doc. 27-2 at 46–50.)

Therefore, Plaintiffs' contentions as to a long-term relationship lack merit, and CEC's motion for summary judgment on this ground will be granted as well.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that CEC's motion for summary judgment (Doc. 25) is GRANTED and, in light of the court's previous dismissal of all other claims for relief (Doc. 17), this action is DISMISSED WITH PREJUDICE.

                                              /s/   Thomas D. Schroeder
                                       United States District Judge

November 28, 2017